The case is MIT v. Micron Technology, 16-2358. Counsel Reines, you reserve five minutes of your time for rebuttal. Is that correct? Yes, Your Honor. You may proceed, sir. Thank you, Your Honor. May it please the court. The primary error committed by the district court here is that it appears not to have considered on an independent basis the substantive weakness of the plaintiff's position. And that apparent failing. So the apparent and appears not. So we've said, as you know, a fair number of times that we don't infer lack of consideration from lack of explanation on a point. Sometimes with reviewing administrative agencies, you actually have to give the explanation. But particularly when reviewing district courts on discretionary matters, we don't infer lack of consideration. So don't you really have to be arguing, on the assumption the district court considered the point, there's only one conceivable resolution of the point. And I can show you that nobody in their right mind could read this Japanese reference and think anything but it's anticipatory, or I forget whether it's just 102 and 103? Yes. Respectfully, I disagree with the premise. The premise is that the law is there's no findings ever required when there's a discretionary decision. Superior Fireplace, which Judge Lynn may be familiar with, held specifically that there was a lack of sufficient findings to review the decision. To my mind, in the wake of HALO and Octane and Highmark, it's more important that we ask of the district courts to express reasoning or findings, not in elaborate detail, if not called for. It's case specific. But in order to measure whether discretion is properly used, we can't be completely standardless. We can't turn these decisions that are very important, as the court knows, into something that's completely discretionary and no findings are necessary. Then we would have a lawless situation. And HALO is very specific about the importance of this court's function. I read HALO a little differently than most people in the community. It wasn't just we're devolving power down to the district courts. Well, it's discretionary, but we learn from the discretion. And there's a factual history that's created and common law is created. And this court is responsible for managing that body of law and plays an important safeguard role. That can't be done without statement of findings. Now, I agree that it's case specific. Just because someone files a fees motion, we don't need a thesis from a district court judge. They've got a busy record. There's three things here, three particular circumstances, that I think demand on this record findings as to the substantive weakness of the position. The first is, in 2010, the demand was for $165 million from a financially weak Japanese company. Someone came with a big fancy PowerPoint and a whole bunch of numbers and a whole business model and said, you owe $165 million. OK? Then they said, and patent infringement's serious, and willful infringement is really serious. If you're going to wield a patent like that, then you're going to fold like a cheap tent when that company's taken over by Micron, a sophisticated American company with a premier legal department. And you're going to collapse down to, well, how about $15 million?  OK, well, we just give up the patent. That kind of collapsing, in the cases Raylon, which Judge Rain is familiar with, you're all familiar with it, but more so, was a situation where when you end up with a demand like that and you're saying that there was a base of exposure that you thought you'd get $165 million from, there's a problem. That's a red flag. Red flag number two, to my mind, is Did you make these arguments before the district court? I mean, I think the arguments were made. I mean, the different form and so forth. I don't see much difference between the arguments made to the district court and the ones that are being made now in the brief and where you're headed. And this is an abuse of discretion standard we have. Seems to me you have to present something different than what was argued before the court in order to get you beyond an abuse of discretion. Well, I agree and disagree. Let me start where I disagree. Where I disagree is if we brought something up that we hadn't raised in the motion below, it wouldn't be fair to a district court judge. So we're not going to rewrite the theory of the fee motion. But where I agree is that this is a court of review, not a court of first instance. And to this court, the argument has to be styled as an appellate argument. And here it is. Because it appears there was no independent analysis. The problem is the fact that three expert examiners, in the words of the district court judge, granted ex parte certificate seemed to be enough to suggest that the patent had enough validity to it that it justified what was otherwise sketchy circumstances in our view. And that's a problem. But why can't one read the paragraph, I think, to which you're referring, the bottom of six, top of seven, as saying, it's not just that three expert examiners agreed. I've actually looked at this explanation. Well, he doesn't then go on to say, now let me walk through the explanation in the kind of detail that MIT's red brief here does. But why is it unfair to read that as I'm actually saying there's a colorable argument based on the explanation together with three patent examiners finding it sufficient? That's a good inquiry. And the answer is, one, it's not just that paragraph. It's the following paragraph. It is at least doubtful that there's a problem where three expert examiners. So he goes back to it again. There's no statement that he looked at the end. He didn't say, I looked at the issues and they're fine. But I think the most important thing is, keep in mind that in this situation. Well, when you made your fee argument to the district court, did you say three administrative patent judges found in instituting an IPR that this was reasonably likely to be found anticipated or obvious? Because I can easily read this paragraph, this page seven paragraph, as a response to that saying, if that's the game you want to play, there's something on the other side at that proxy level. We did. And I think the answer is, and it should have been considered, as should the ex parte certificate being issued should have been considered. It's a totality. But what wasn't considered was the weakness of the position. Let me just say briefly, on the contacts, I mean, the gist of the invention, we can call it a Japanese reference. The gist of the invention was that if you have greater resistance at the contacts to the fuse, that that would prevent the electricity from going out to the contacts. That's exactly what the Japanese reference says. The Japanese reference says you put a greater resistance to the contacts, and that works better. It's the invention. There's just no two ways around it. Now, it says, and to accomplish that, use three different materials. Tungsten, titanium, and titanium nitride. In their ex parte, they applied tungsten. Does the Japanese reference say you can use any one of those materials alone? Yes, absolutely. Undisputed. There's no question about that. It said there's three different materials you can use to accomplish the goal of what's been claimed invention. And then they take one example, and they say it doesn't work. The other two, titanium and titanium nitride, are massively resistant. Massively resistive. And this is where their argument is so weak, they start tripping over their own shoelaces. And I mean this in a serious way. Their argument as to why they didn't disclose to the patent office the use of titanium, which would clearly be the resistance at the contacts that you would need to meet the claims, was because it's too resistant. Who in their right mind would put in a circuit something so resistant that you wouldn't have energy? It would be so resistant, people would like it, because it wouldn't be real good. It wouldn't pass the energy. So they're saying it's too resistant. And so they just excluded it and didn't mention it to the patent office, when the invention is using highly resistive material as the contact. OK? So going to the patent office and there's three materials suggested, and using one and ignoring the other two, and they have some make-weight arguments to why the other two wouldn't satisfy. Not that it's not 10 times more, it's actually about eight times more resistant than tungsten. They have this argument that you wouldn't know the dimensions. Well, they plugged in dimensions when they wanted to show that tungsten wouldn't be good enough. We're saying, just put titanium in the exact same dimensions that you said tungsten was in, when you were interpreting the drawings. Just plug and chug. So in Hyke-Verba, the Japanese reference says, we want to use materials that have greater resistance here, to avoid problems with the electricity traveling out. Use these. They're highly resistive. And they say, well, you wouldn't use those. They're too resistive. That's the argument? You're kidding? But it was an argument. What does that mean? Here's my problem. Because as Judge Raynault pointed out, the standard of review here is abuse of discretion. And it seems to me that you've got a litigation here where there were arguments made on validity. There were arguments made over the years on infringement. And the parties fought about these things for quite a while. It seems to me this is sort of garden variety, normal patent infringement litigation. Different strategies were employed. Go back to the patent office with ex parte, et cetera. That's what patent attorneys do. And yes, you have arguments about, well, the infringement. That's a clear argument. The other side, I'm sure, is going to say, no, it's not clear at all. The same thing on validity. Now we've got to take a look and say, well, the district court abused its discretion in concluding that this case was not exceptional, that this case was not, didn't stand out from the normal patent litigation. But that's not the argument that I'm making. Because I think it's not the right argument. Correct me where I'm wrong. The right argument here is that the district court judge was wowed by the fact that there was an ex parte re-exam certificate granted. He wanted to move the court. We're assuming that based on the fact that his explanation was abbreviated and simply mentioned that, wow, three examiners found it. Well, he mentioned it twice. But I think that's the only substance in here. And I think asking courts, again, in this post where we're giving them this untethered discretion, the rules that this court has made are all gone, to put findings down on an independent investigation on the weakness with the red flags that are here, the slight of hand on Tungsten, the drop down from $160 million to a pittance, these different things, and to ask them to make a finding to make sure that he's not just relying on the star power of an ex parte re-exam certificate, how I read it. The final point I'd make on this before I preserve some time, and I apologize, is the Veronata case that Judge Toronto had. And I was one of the litigants on that. There, there was a lot of explanations for what the board did that certainly showed that the patent was probably properly upheld. The court was concerned that there may have been a legal path that was stumbled upon and remanded it for consideration by the lower tribunal to make sure that that mistake wasn't made. What I'm proposing here is in this age of essentially unfettered discretion where this court needs to supervise, asking for an independent determination with findings on this issue, on these facts, not every issue on every fact, as to ensure that there wasn't just the star power of the ex parte re-exam. Just to protect against that is the right thing for the system and the right thing for this case. OK. Good morning, your honors. Micron overlooks the district court's findings on exceptionality. And Micron assumes the worst. Micron assumes bad faith by Dr. Bernstein. Micron assumes bad faith by MIT. Micron assumes- Was the district court wowed by the re-exam certificate? No, your honor. That was one factor considered in the totality of the circumstances. The district court held a- What are the other circumstances? The district court held a morning hearing. And the district court engaged on the substantive issues of validity. I'll go in and point specific points to the transcript. The district court made a factual finding against Micron on every single issue with regard to width and thermal resistance. That's at A6 and A7. With regard to the infringement issue on the substrate, that's at A6. With regard to the alleged bad faith conduct before the re-exam found against Micron, that's at A8. With regard to the allegations that there was bad faith conduct before the PTAP. With regard to what you said was the transcript, I think it would be an interesting and, to you, helpful thing if some of the generalities of the resulting opinion were backed by discussion in the transcript. Yes, your honor. I'm not suggesting it's necessary,  I appreciate that, your honor. And the transcript is at the back of volume two. And I'll point, I think it's beneficial to read the entire transcript that we included. But in terms of sites. You're not going to read the entire volume. No, I've got two specific parts to cite to, on both of the validity issues. One is with respect to width, where Judge Saylor from the District of Massachusetts engaged on the issue and probed Micron's lawyer, which is a different lawyer, probed Micron's lawyer. This is at A4077 through 78. A4077 through 78. It's cited in our red brief. And this is where Micron had to admit that COIU never speaks of width. The 221 patent's about increasing the width of the cut link pad. And in probing by Judge Saylor, Micron's lawyer had to admit that the reference, this Japanese reference, COIU never discusses width. And they are simply inferring it from part A of figure one. That's the first point I'd point out. The second is with respect to this issue of increased resistance. And we're talking thermal resistance. That's what the claims of the 221 patent were cited as thermal resistance. As opposed to electrical resistance. Electrical resistance. It's an important point I'm going to get to, Your Honor, because they raise a new incorrect argument on that issue in their gray brief that I want to address. If we look at the trial transcript at A4092 through 96, Judge Saylor engages extensively with me regarding the difference between what's in COIU, a discussion of thermal resistance, and what's in the claims of the 221 patent, which is thermal resistance per unit length. And that's seen in the 221 patent at A36. And as Judge Toronto, as you suggested, I submit what Judge Saylor was doing here was responding to their point on the IPR institution. Below on their fees motion and in their appellate brief, they're relying very heavily on the PTAB instituting the IPR, which is on the standard that there's a reasonable likelihood that they're ultimately going to prevail. So they're heavily relying on that institution decision. And Judge Saylor rightfully responds when considering whether our arguments were exceptionally bad, whether they were frivolous on the merits, responds that, well, with the same reference before the PTO in the re-exam, three re-examination experts confirm the claims. That is the evidence that Judge Saylor had before him. On the one hand, he had the institution decision. On the other hand, he had the re-examination confirmation certificate. And he had the briefing and the exhibits. As this court has indicated, the court is not required to have a mini-trial to decide a fees motion. That's in SFA new way that we decided in a briefing. It's also in Judge Bryson's decision in Trover. He decided, based upon the evidence he had, he decided on every factual issue his findings were not clearly erroneous. He did not constitute, did not commit an abuse of discretion. He should not be subject to a reversal or a remand. In my remaining time here, what I'd like to address are the three new substantive arguments on each of the points that they raised in their grade brief. And each is incorrect. And each reinforces that Judge Saylor did not abuse his discretion. The first is in the grade brief, at the bottom of page 9, spanning the top of page 10. There, Micron represents to the court that figure 1A of COIU only shows the very top surface. And it does not show the lower layers that are in figure 1B. That's patently incorrect. As we see in looking at COIU at A540, the lower layers of figure 1B are shown by dashed lines. The hidden lines are shown by dashed lines, which is typical in engineering drawings. And it's a critical argument here, because Micron makes this new argument in the reply brief to argue that figure 4 does not refute their attempt to combine, to rip out part A of figure 1, which has two parts, A and part B, to rip out part A and combine it with figure 3 to make their new trying to show a wider fuse pad for the 221 claims. The fact of the matter is that COIU never teaches a wider fuse pad. All it's about is reducing the length. We see that in claim 1 of COIU and in the other claims. The dependent claims do not change that. All that's carried over from claim 1 to the dependent claims is the reduced length. There's nothing about width. Can you rehearse for me, and I realize this would be uncertain to you. In a way, I might understand what Dr. Bernstein explained about what was going on in figure 1 and why Micron's version that this wide-ish pad, numbered 1, isn't quite obviously wider than, I guess, either the 3's or the 2's. This is with respect to figure 1 itself, figure 1A and 1B. Yes, and put aside for now, please, the proposition that a diagram isn't necessarily to scale. So we don't know if it's actually 10% wider. Try to put that aside. I thought Dr. Bernstein had some explanation that the comparison between 1 and 2, or even 2 and 3, was not the right comparison, or something like that. Yes, and this is in our red brief at 40. His explanation is the comparison should be between 2A and 2B, the 2A or 2B parts of the cut link pad in COIU, with 3. And if we look at- And there, that point would be 3 is actually wider than 2, not the other way around. It's the opposite. So explain that to me. It's the opposite of the claim to mention. The explanation, an explanation that I believe Dr. Bernstein gave is that his invention was about retaining thermal heat, thermal energy on the cut link pad. And the way he taught that is by having a narrower cut link pad at the connection point to the line, so like going from a narrow pipe to a water pipe. And we're considering water flow. And 2A and 2B are narrower than the next connecting pipes, the three. So it's going to constrain the water flow, or in this case, constrain the thermal energy, and retain it on the cut link pad, and cause fracturing there when the laser beam shines on the cut link pad. I see what you're saying. Bernstein was saying, I think that's a bad thing, and I'm doing something different. He was just, no, he's saying his invention was the opposite of that. I think I misstated. His was just the opposite, yes. His was having the connection point wide, and having the next point from the lines, thank you, from the lines to be narrower. So going from a wide pipe to a narrow pipe, so if you have water or thermal energy rushing down, it's going to stop hard at the connecting point. So his comparison was looking at 2A and 2B to three, and that was the opposite of the claimant invention. So in terms of the claim limitations, what's the explanation for saying what's really going on in COIU is something, if you look at it in our claim terms, requires you to compare two to three. I'm going to forget about the A's and B's. It's just the same, two and three. And they say, no, if you look at this, it's absolutely clear what you're doing is comparing three to one, or two to three, or two to one. I think they've given up on that in their appellate brief, but below they were trying to make the comparison, I believe, between one and two. One is a wide thing. I think they were trying to take the widest point of one. What does Bernstein say about why that's not the right thing to be looking at? Well, the claim language is cut link pad, that the cut link pad is 10% wider than the electrically conductive lines. There was never a Markman decision. There was never a claim construction hearing as to what width should you take. But Dr. Bernstein's explanation is that the operative width is the interconnect width, because that's the one that matters in terms of going from wide to narrow to constraining the heat. It's the one that creates this effect of constraining the heat, the thermal energy, on the cut link pad. Ultimately, the question is, was that a frivolous argument? That's the ultimate question here, and I submit that Judge Staley did not. You're using frivolous as a shorthand for exceptionally weak. I actually think in the octane fitness decision, that's one of the factors. With regard to the merits is frivolity. You look to whether it's a frivolous on the merits when you're discussing the merits of the argument. I would like to get to the other two new arguments. Can you talk about titanium and tungsten? Yes, and that's the next point. This goes to their second new argument. This is the bottom of page 12 of their gray brief. Bottom of page 12 of their gray brief. There, they suggest that the claims of the 221 patent specify a higher electrical resistance, and therefore, it would be natural to use titanium or titanium nitride as the electrically connective lines. Well, that's not correct. The claims of the 221 patent that are seen at A36, those recite a higher thermal resistance per unit length. They're mixing and matching. They're confusing thermal resistance, which is the resistance to heat flow, with electrical resistance, which is the resistance to electrical flow. And the claims recite that the lines are electrically conductive lines. And what we're dealing with here are electrical devices, memory devices. They have to conduct electricity. And I submit it was at least reasonable and not frivolous for Dr. Birdstein to rule out the use of titanium or titanium nitride, which are highly electrically resistive materials. They resist the flow of electricity, which is the relevant issue. Finally, the third new argument they raise. This is at page 16 of their gray brief. Page 16 of their gray brief at the top with regard to the infringement issue. There they suggest a new claim construction. They depart from what they were proposing in their blue brief. They propose a new claim construction on page 16 of their gray brief to try to reconcile the beginning language in the claim and the ending language of the claim, which they ignored in their blue brief. And they propose that now that on the substrate with respect to infringement means that the cut link pad connects to the electrically conductive lines on the surface of the substrate, and that they then extend vertically into the substrate. The reason that argument doesn't help Micron on infringement is that it reads the claims precisely on the accused product which was the LP to product. We see that at A432. A432, if we look at that, we see that in the accused product, the cut link pad in the LP to device connects to the electrically conductive lines on the surface and then extends into the substrates. And that's exactly as shown in the 221 patent in the figures 10 and 11, which is at A26. And it's exactly as claimed as A36 as we see at A36 in the 221 patent. The final new argument they raise is a suggestion of a remand. It's the first time we see the Superior Fireplace case, the Gector case, the Orosi case. Those cases are distinguished. Superior Fireplace, no written decision, no oral argument at all. Gector and Orosi, those are from the PTO. If I had a chance to respond, I would have pointed out the Vapor Point decision from this court last fall and the University of Utah versus Max Planck decision from just last month. Thank you, Your Honor. Thank you. Mr. Suarez, I'm gonna refer you back to three minutes. That's very kind. Thank you, Your Honor. Let me start with Judge Serrano's question. It's simple to explain. The pad one, their argument is that two is part of one so that the narrowing down to two, because two of those two columns means that that's narrow compared to the lines which are broader, which is the underneath. So their argument is if you consider those two stanchions or those two contacts to be part of the fuse, then it's narrow. That works unless you have to admit that claim three is a side view of, figure three is a side view of figure one, which it obviously is because claim four, by referring to the specific numerals, refers to the fuse pad of one with the contact points of 20. And there's no, I don't even think, you heard what I consider some technical mumbo-jumbo there. I don't even think they deny at this point that if figure one and figure three work together that it's wider. They do work together. It's obvious that they do based on the claim. It shouldn't really take a lot of effort to figure that out. The second problem, so that's that whole issue. It's simple. The other issue they tried to make complicated is this thermal electivity versus electrical. The claim requires thermal conductivity being more resistive in the contacts. The patent says, the prior art says, in the present embodiment, referring to figure three, the thermal resistance of the material for filling the contact holes, 21A and B, is selected so as to be higher than the thermal resistance of the fuse member. For example, tungsten, titanium, titanium nitride, or the like may be used. So they're saying exactly the claim term. All right, it's this kind of appellate mumbo-jumbo that is why we need a district court to make findings. If they're so confident they're right, why not have a remand? I wouldn't call it mumbo-jumbo. And these are, these sound to me to be legitimate arguments. The electrical conductivity versus the thermal, even though the prior art's in thermal. Without stating whether they're winning arguments, they're valid arguments or legitimate arguments. On that one, I don't agree. But the prior art says thermal conduct resistance. The claim says thermal resistance. Same, same. I just don't. I mean, I understand there's legitimate advocacy, but let's not totally lose it. But I guess the point is, rather than playing guessing games based on a transcript, based on a 15 minute argument where arguments like that can be made and played with. 15 minutes, you said? 15 per side. 15 minute argument here. Wasn't there a reference to something like a mourning? Well, I mean, I think a mourning is an exaggeration. What I want to say about the transcript, because I think it's fair to look at it, every comment that the judge made is the excerpts that were selected. So in whatever number of pages, there's about two interchanges or three interchanges that he made total. But the point remains. Maybe some judges listen to the advocates more than other judges. Well, we know that's true. Look, my only point is that I think that the order reads that he may have relied on the ex parte re-exam certificate as the basis. I think that's how I read it. And ensuring that that's not a mistake that's made or ever made again in the future, just because there's a re-exam certificate issue doesn't mean that that's a credible position. You go in ex parte. You can tell them what you want. It's a one-sided presentation. They're asking for a remand. So this judge puts findings that this court can review. So we're not debating thermal resistance versus electrical resistance on appeal. It's very good for the system and an appropriate thing for the case. All right? Thank you very much. I appreciate it. Thank you.